OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS

June 15, 1999

The Honorable José R. Rodríguez
El Paso County Attorney
County Courthouse
500 East San Antonio, Room 203
El Paso, Texas 79901

Opinion No. JC-0068

Re:  Whether a hospital district is authorized to execute a contract to hedge against interest rate fluctuations  (RQ-1157)

Dear Mr. Rodríguez:

You ask whether the El Paso Hospital District, established under article IX, section 4 of the Texas Constitution and chapter 281 of the Health and Safety Code, is authorized to execute an interest rate hedge contract that entitles the District to receive a lump sum if market interest rates rise in relation to the interest rate on certain of the District's outstanding bonds but that requires the District to pay out a lump sum if interest rates fall. A hospital district has only such authority as is expressly conferred on it by statute or necessarily implied from the authority expressly conferred to effectuate the express powers. The District has express authority to manage a hospital system and issue bonds to acquire hospital facilities or to refund outstanding bonds issued for hospital purposes. Because execution of the interest rate hedge contract is unnecessary to effectuate issuance of bonds or refunding bonds, it is the opinion of this office that the District is not authorized to execute such a contract.

You inform us of the following facts giving rise to your question: In February 1996, the District entered into a Warrant Purchase Agreement (the "Warrant Agreement") with a financial institution as purchaser of the Warrant (the "Warrant Holder"), an underwriting firm that acted as a broker in the transaction, and the Warrant Holder's affiliate, as agent. In exchange for the Warrant Holder placing $1.85 million in escrow (the "Escrowed Funds") for the benefit of the District, the District issued a warrant (the "Warrant") that entitled the Warrant Holder or its transferee, in certain circumstances, to receive on July 1, 1998 a given amount. That amount ("Settlement Amount") was calculated by a formula whereby it would *decrease* as interest rates associated with a hypothetical bond issue having the characteristics of an outstanding bond issue of the District increased or *increase* as interest rates of the hypothetical bond issue decreased. If interest rates *increased* sufficiently by July 1, 1998, the District would retain the Escrowed Funds. But if the interest rates *decreased* to or lower than the interest rates of the hypothetical bond issue, then the Warrant Holder would be entitled to a Settlement Amount. Interest rates in fact declined, and the District was required to pay a Settlement Amount of approximately $5.6 million to the Warrant Holder, against which amount the District applied the Escrowed Funds, including interest earnings, totaling $1.9

million.  Thus, the District had to pay to the Warrant Holder approximately $3.9 million in addition to the Escrowed Funds.  Because the Warrant was not a bond or a bond-related document, it was not submitted to nor approved by the Office of the Attorney General.[1]

The Warrant, you inform us, was an attempt to "lock in interest rate savings" with respect to the District's outstanding General Obligation Refunding Bonds, Series 1988 (the "Outstanding Bonds") without actually refunding them.[2]  The "hypothetical" bonds in the Warrant transaction described above reflected the annual debt service required with respect to the Outstanding Bonds. Interest rates on the Outstanding Bonds issued in 1988 were considerably higher than the prevailing interest rates in 1996.  But the District could not redeem the Outstanding Bonds in 1996 because they were not subject to redemption until July 1, 1998, and they could not be "advance refunded"on a tax-exempt[3] basis under federal tax law.[4]  (The District did not want to issue refunding bonds in escrow or enter into any forward delivery contract, which were the alternatives to the Warrant transaction for addressing the federal tax limitations.[5])  The Escrowed Funds in the Warrant transaction represented the present value of the debt service savings the District would have achieved over the

---

[1]The District's bonds together with the transcript of the proceedings related to the bonds, like those of other public bodies in the state, must be submitted to and approved by the Attorney General.  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 281.103, .105 (Vernon 1992); TEX. REV. CIV. STAT. ANN. art. 717k-8 (Vernon Supp. 1999).

[2]A refunding involves the issuance of new bonds by a governmental entity, the proceeds (either the sale proceeds or the proceeds and the investment earnings thereon) of which are used to pay debt service (principal, interest, and premium, if any) on and retire an outstanding issue of bonds. D. FRANKLIN & J. PRENDERGAST, GLOSSARY OF PUBLIC FINANCE TERMINOLOGY 35 (1992) [hereinafter GLOSSARY]; ARTHUR M. MILLER & VALERIE PEARSALL ROBERTS, *Refunding Outline,* 365 PRACTICING L. INST., TAX L. & ESTATE PLANNING COURSE HANDBOOK SERIES, TAX L. & PRAC. 269, 271 (1995) [hereinafter PLI].  A governmental entity may undertake a refunding to save on interest cost, stretch out or otherwise restructure the debt service, or remove restrictive covenants in the bond documents. GLOSSARY *supra,* at 35; PLI at 274.

[3]"The term 'tax-exempt' means, with respect to any bond (or issue), that the interest on such bond (or on the bonds issued as part of such issue) is excluded from gross income [of the recipient]." 26 U.S.C.A. § 150(a)(6) (West 1998).

[4]Federal tax law distinguishes between "current" and "advance" refundings.  A "current" refunding is a refunding in which the prior bonds are called for redemption or mature within ninety days of the issuance of the refunding bonds; all other refundings are treated as advance refundings. *See* 26 U.S.C.A. § 149(d)(3), (d)(5) (West Supp. 1998); Treas. Reg. § 1.150-1(d)(3) & -1(d)(4) (1999).  Accordingly, an "advance refunding" is a refinancing of outstanding bonds or obligations—the refunded bonds—by a new issue of bonds—the refunding bonds—more than 90 days prior to the date on which the outstanding bonds or obligations can be redeemed, and deposit of the proceeds of the refunding bonds in escrow to retire the refunded bonds when they can be redeemed. *See* 26 U.S.C.A. § 149(d)(5) (West Supp. 1998); GLOSSARY *supra,* at 1.  Among other restrictions, original new money bonds issued on or after January 1, 1986 (or successor current refunding bonds) may be advance refunded once.  26 U.S.C.A. § 149(d)(3) & (d)(6) (West Supp. 1998).  Those issued prior to January 1, 1986, may be advance refunded twice.  *Id.*  The District's Series 1988 Bonds had already advance refunded a prior issue and could not be advance refunded again.  Letter from Mark E. Mendel, Mendel Guzmán Blumenfeld, LLP, to Sarah Shirley, Chair, Opinion Committee (Nov. 17, 1998) (on file with Opinion Committee) [hereinafter Mendel letter of 11/17/98].

[5]Mendel letter of 11/17/98, at 3.

life of the Outstanding Bond if it could have refunded them by the issuance of refunding bonds at the lower 1996 interest rates. The Outstanding Bonds remained outstanding, however, and there was no actual debt service savings with respect to them in 1996. The District did achieve an actual debt service savings of approximately $7 million when it refunded the Outstanding Bonds in August 1998 in a separate transaction by issuing refunding bonds.[6] This savings was, of course, spread out over time—the life of the refunding bonds—and not received as a lump sum payment.

You believe that the District did not have authority to execute the Warrant Agreement or pay the Settlement Amount. In contrast, bond counsel to the District on the Warrant transaction contends that the District did have such authority derived from the District's power to borrow money and issue bonds. As bond counsel notes, this office does not interpret or construe particular contracts in an attorney general opinion. Tex. Att'y Gen. Op. Nos. DM-198 (1992) at 10; JM-697 (1987) at 6. This office, however, does address a public entity's authority to contract with respect to a particular subject or to accept particular terms if the question can be answered as a matter of law. Tex. Att'y Gen. Op. No. DM-192 (1992) at 10 n.14. Accordingly, while we cannot review the validity of the particular transaction giving rise to your request, we can generally address the District's legal authority to issue an instrument like the Warrant.[7]

The Warrant is a type of "derivative product," used to hedge[8] against interest rate fluctuations in the market. Derivative products are specially designed financial instruments such as interest rate swaps, inverse floating-rate products, currency swap agreements, and forward municipal contracts that "derive" their value from the performance of an underlying asset, such as securities,

---

[6]See transcript of proceedings relating to Series 1998 Bonds submitted to the Office of the Attorney General as required by article 717k-8, TEX. REV. CIV. STAT. ANN. (Vernon Supp. 1999) (on file with Office of the Comptroller of Public Accounts).

[7]Bond counsel also questions this office's authority to issue an opinion in response to a request from a county attorney. *See* Mendel letter of 11/17/98, at 2. We believe this office has the requisite authority. This office has issued opinions responding to requests from county attorneys since at least 1917, relying on current sections 402.042 and 402.043 of the Government Code and their predecessor, article 4399 of the Revised Civil Statutes. *See also* 35 DAVID B. BROOKS, COUNTY AND SPECIAL DISTRICT LAW § 3.19 (Texas Practice 1989) (listing county attorneys as authorized requesters). No court has questioned that authority.

[8]One tax court has described a "hedge" as follows:

> A "hedge" is an investment that is made to offset an adverse economic performance of another investment. For example, if the profit of an investment required a *rise* in market prices, a hedge to that investment could be established to profit from a *fall* in the market prices. Effective use of hedging instruments requires careful analysis of the exposure involved. The costs of hedging and the possibility that the hedge may diminish the profitability of the program being hedged each require quantification of the expense and duration of the hedging activities as they relate to the investments hedged.

*Seykota v. Commissioner of Internal Revenue*, 61 T.C.M. (CCH) 2706, 2710 (1991).

commodities, currencies, or interest rates. 3 M. DAVID GELFAND, STATE & LOCAL GOVERNMENT DEBT FINANCING § 11:06.50 (West Supp. 1998); Robert C. Downs & Lenora J. Fowler, *Derivative Securities: Governmental Entities As End Users, Bankrupts And Other Big Losers*, 65 UMKC L. REV. 483, 487 (1997). They are generally used by investors to (1) hedge against adverse changes in the value of assets or liabilities, (2) restructure financing terms more favorably, (3) change the mix of assets in a portfolio, and (4) to speculate on the direction interest rates will move in the hope of gaining a pure profit. Alexander E. Kolar, *Hammersmith Meets Orange County: "Wishing Upon A Star" With Taxpayer Money In The Municipal Bond Derivative Market*, 49 WASH. U. J. URB. & CONTEMP. L. 315, 320 (1996). Governmental debt issuers have used these instruments to reduce borrowing costs by taking advantage of declines in interest rates after bonds have been issued, to reduce the risk that interest rates will rise on variable rate bond issues, and to speculate in the market place. GELFAND, *supra* § 11:06.50, at 12-13.

It has been said that while derivatives may have legitimate uses, their use by governmental entities as speculative investments can result in enormous losses from which their investors may not recover, as shown by the recent experience of Orange County, California. Downs & Fowler *supra*, at 483; Kolar *supra*, at 315. Before the Orange County derivative failure in the United States, the most legally significant derivative loss occurred when the Hammersmith and Fulham London Borough Council, a local authority incorporated by English royal charter, defaulted in 1989 on payments it owed to various banks under a series of swap contracts. The British House of Lords subsequently held that the Council did not have authority to enter into the swap contracts. As one of the leading treatises in the area of governmental debt financing cautions, "[a]bsent express statutory authorization . . . local government authority to participate in the derivative products market must be resolved," noting that the "significant opinion by the British House of Lords [in *Hazell v. Hammersmith & Fulham London Borough Council*, All E.R. 545 (H.L. 1991)] has cast doubt on how a state court might respond" to the argument that the authority to borrow through tax-exempt bond financing provides additional powers to enter derivative contracts. GELFAND, *supra* § 11:06.50, at 13.

We examine *Hazell v. Hammersmith & Fulham London Borough Council* in detail for two reasons. First, no American courts appear to have considered a governmental entity's authority to execute derivative contracts. Second, and more importantly, the nature of the governmental bodies at issue are similar. For instance, as a special purpose district, the District has limited authority, *Tri-City Fresh Water Supply Dist. No. 2 v. Mann*, 142 S.W.2d 945, 948 (Tex. 1940); Tex. Att'y Gen. Op. Nos. DM-107 (1992) at 2; DM-29 (1991) at 3; JM-258 (1984) at 1, and "may exercise only such powers as have been expressly delegated to it by the Legislature, or which exist by clear and unquestioned implication," *Mann*, 142 S.W.2d at 946. It has only such implied powers as are necessary to effectuate the powers expressly granted. *Id.* at 947. In other words, implied powers are "such as are indispensable to the declared objects of the corporation and the accomplishment of the purposes of its creation [,]" and not those "which are merely convenient or useful[.]" *Id.* Likewise, the Council at issue in *Hazell* was not a sovereign body, but could only do such things as were expressly or impliedly authorized by Parliament. *Hazell*, 1 All E.R. at 548.

Like the Warrant about which you ask, the swaps at issue in *Hazell* were derivative products used to hedge against interest rate fluctuations in the market. The *Hazell* opinion described swap contracts generally as "'an agreement between two parties by which each agrees to pay the other on a specified date or dates an amount calculated by reference to the interest which would have accrued over a given period on the same notional principal sum assuming different rates of interest are payable in each case.'" *Hazell*, 1 All E.R. at 550; *see also BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1469 n.1 (11th Cir. 1992) (An interest rate swap is an agreement by which one party agrees to pay the counterparty a fixed rate of interest on a notional amount for a specified period, and the counterparty agrees to pay to the first party an adjustable rate for the same period.). The specific swaps in question, according to the *Hazell* opinion, "were undertaken in the hope that the burden of interest payable in respect of borrowings by the [C]ouncil would be mitigated by profits from swap contracts whereby the council successfully forecast movements in interest rates." *Hazell*, 1 All E.R. at 550. Generally, the opinion noted, the Council would profit if interest rates fell, but would incur substantial losses if interest rates rose. *Id.* at 545. The Council's losses totaled approximately $337.4 million. Kolar *supra*, at 317; *see also Hazell*, 1 All E.R. at 552 (auditor's calculation of Council's losses).

The Act of Parliament establishing local governments, including the Council, granted a local authority express power to borrow money and prescribed the method of borrowing. *Hazell*, 1 All E.R. at 548, 558. Given that a local authority did not have express authority to do the swap transactions, which the banks conceded, the question presented was whether the swap transactions were incidental to a local authority's borrowing power. *Id.* at 553, 556. The opinion summarized the relevant authority on incidental powers as relevant to the swap transaction as follows:

> The authorities also show that a power is not incidental merely because it is convenient or desirable or profitable. A swap transaction undertaken by a local authority involves speculation in future interest trends with the object of making a profit in order to increase the available resources of the local authorities. . . . Individual trading corporations and others may speculate as much as they please or consider prudent. But a local authority is not a trading or currency or commercial operator with no limit on the method or extent of its borrowing or with powers to speculate. The local authority is a public authority dealing with public moneys limited by Sch[edule] 13 [setting out the purposes for which it may borrow money].

*Id.* at 556. The opinion examined at length a local authority's borrowing powers under the Act and the purpose of the swap transactions. It concluded that the swap transactions were inconsistent with an authority's borrowing power and that the contracts were ultra vires. *Id.* The opinion stated that when a local authority borrows money, it must take into consideration the provision of the Act, the method of borrowing, repayment, prevailing interest rates, and the possibility that interest rates may rise or fall during the loan period. *Id.* at 558. And, if the local authority finds that there has been

a great shift in interest rates that affects a particular borrowing, the opinion explained, it is "not without remedial action":

> It can convert a loan taken out . . . from a variable rate of interest into a fixed rate of interest. It can pay off an expensive loan and take out a new loan. It is said that the cost of paying off an old loan and taking out a new loan would be greater than the cost of entering into swap transactions. But this fact alone cannot render swap transactions legal.

*Id.* Finally, noting that Parliament had granted certain building authorities express power to enter into swap transactions, Lord Templeman stated:

> It is for Parliament and not the courts to decide whether there should be conferred on local authorities unlimited power to hedge or a power limited for the protection of taxpayers and ratepayers. Parliament might decide that it was unnecessary or unwise to confer power on local authorities to enter the swap market at all. . . . The object of the doctrine of ultra vires is the protection of the public.

*Id.* at 560.[9]

With the above background, we consider the general features of the financial transaction about which you ask. This transaction, evidenced by the issuance of a "warrant," like the derivatives described above, is undertaken to profit from interest rate movements, which profit may be but is not required to be used to reduce interest payments on existing debt. It gives the issuer an opportunity to obtain a lump sum dollar amount if interest rates perform as the issuer anticipates and requires the issuer to pay out a sum if they do not. It is related to outstanding bonds only to the extent that if interest rates rise, the amount obtained by the issuer theoretically compensates the issuer for the "loss" of potential debt service savings as a consequence of the issuer's present inability or disinclination to refund its outstanding bonds at the lower interest rates. But whether the issuer receives or makes a payment does not affect the outstanding bonds, debt service on those bonds, or the issuer's right to refund the outstanding bonds by issuing refunding bonds in the future. *See Hazell*, 1 All E.R. at 586 (purpose of swap transaction not to facilitate borrowing because original underlying debts continue in existence and are unaffected by swap transactions; in many

---

[9]The opinion also dismissed the contention that if the swap transactions were not incidental to borrowing, they were nevertheless authorized as incidental to debt management. The opinion observed that debt management is not a function but a way of describing prudent and lawful activities of a local authority. *Hazell v. Hammersmith & Fulham London Borough Council*, 1 All E.R. 545, 558 (H.L. 1991). Thus, if swap transactions were lawful, a local authority would be under a duty to consider entering into swap transactions as part of debt management, "[b]ut if a swap transaction is not lawful then it cannot be lawful for a local authority to carry out a swap transaction under the guise of debt management." *Id.*

cases, swap transactions are entered into long after borrowing and are not even contemplated at time of borrowing).

In sum, the significant features of the warrant transaction for the purposes of our analysis are: (1) that whether the issuer profits under the warrant is wholly dependent on the rise and fall of interest rates; (2) issuance of the warrant is a separate transaction from the refunding of the outstanding bonds; and (3) there is no debt service savings with respect to those bonds unless and until they are actually refunded. *See id.* at 554 (swap transactions are separate collateral contracts). With this general understanding of the warrant in question, we look at the District's authority to enter such a contract.

We consider the District's constitutional and statutory powers. The District is a county-wide hospital district established under article IX, section 4 of the Texas Constitution and chapter 281 of the Health and Safety Code. Article IX, section 4 empowers the legislature to authorize the creation of county-wide hospital districts "with power to issue bonds for the purchase, acquisition, construction, maintenance and operation of any county owned hospital" and that "assume[s] full responsibility for providing medical and hospital care to needy inhabitants of the county[,]" in counties with a population in excess of 190,000. TEX. CONST. art. IX, § 4.

Subchapter C of chapter 281 sets out the general powers and duties of article IX, section 4 districts. Such a district is required to assume "full responsibility for furnishing medical and hospital care for indigent and needy persons residing in the district." TEX. HEALTH & SAFETY CODE ANN. § 281.046 (Vernon 1992). A district's board of managers is authorized to "manage, control, and administer the hospital or hospital system of the district," *id.* § 281.047, and to adopt rules governing the system's operations, *id.* § 281.048. More specifically, the board is authorized to "construct, condemn, acquire, lease, add to, maintain, operate, develop, regulate, sell, exchange, and convey any property, property right, equipment, hospital facility, or system to maintain a hospital, building, or other facility or to provide a service required by the district." *Id.* § 281.050 (Vernon Supp. 1999). To effectuate these powers, it is also authorized to contract or cooperate with the federal government, the state, another governmental entity, or a private hospital. *Id.* § 281.051. Additionally, the district is authorized to exercise the power of eminent domain, accept gifts and donations, and to sue and be sued. *Id.* §§ 281.054, .055, .056 (Vernon 1992 & Supp. 1999). Furthermore, the district may establish a health maintenance organization, *id.* § 281.0517 (Vernon Supp. 1999), and create a charitable organization to facilitate the management of health care services or to provide ancillary support services, *id.* § 281.0565.

Subchapter F of chapter 281 sets out the powers and duties with respect to district bonds. The commissioners court of the county, in the district's name and on its credit, is authorized to issue general obligation bonds to acquire, construct, equip, or enlarge the hospital or hospital system if approved by the voters. *Id.* §§ 281.101 (Vernon 1992). Refunding bonds to refund any outstanding indebtedness of the district may be issued without voter approval. *Id.* §§ 281.102, .103(a). When such bonds are issued, the commissioners court is authorized to levy a tax for the benefit of the district. *Id.* § 281.121(a). Proceeds of the tax levied may be used for bond debt service payment or

maintenance or operation of the hospital system. *Id.* § 281.121(c). Before the district's bonds are delivered to their purchasers in exchange for the purchase price, they must be approved by the Attorney General. *Id.* §§ 281.103, .105; TEX. REV. CIV. STAT. ANN. art. 717k-8 (Vernon Supp. 1999).

Additionally, other statutory provisions relating to the issuance of bonds or other obligations may also be utilized by the District. A district may issue long-term, contractual obligations to acquire or use personal property. *See* TEX. LOC. GOV'T CODE ANN. §§ 271.003(4), (5) (Vernon 1988) (governmental agency included hospital district), 271.005 (authorizing governmental agency to execute contract). A district may issue refunding bonds to refund its outstanding bonds or other obligations utilizing the procedures of article 717k of the Revised Civil Statutes. *See* TEX. REV. CIV. STAT. ANN. art. 717k §§ 1 (Vernon 1964 & Supp. 1999) (act applicable to any political district or subdivision having the power to issue bonds and refunding bonds), 2 (authorizing issuer's governing body to issue refunding bonds and deposit proceeds with Comptroller of Public Accounts to retire outstanding bonds), 7A (authorizing deposit of refunding bond proceeds directly with any place of payment for outstanding bonds).

The District may not exercise, however, the powers generally granted to "issuers" by article 717q of the Revised Civil Statutes to enter into "credit agreements." *See* TEX. REV. CIV. STAT. ANN. art. 717q (Vernon Supp. 1999). This statute authorizes certain issuers to issue obligations "and execute credit agreements in relation thereto to finance project costs of an eligible project, or to refund obligations issued in connection with an eligible project . . . ." *Id.* § 2(a). A "credit agreement" is a

> loan agreement, revolving credit agreement, agreement establishing a line of credit, letter of credit, reimbursement agreement, insurance contract, commitments to purchase obligations, purchase or sale agreements, *interest rate swap agreement*, or commitments or other contracts or agreements authorized and approved by the governing body of an issuer either in connection with the authorization, issuance, security, exchange, payment, purchase, or redemption of obligations and/or interest thereon, or as otherwise authorized by this Act.

*Id.* § 1(6) (emphasis added). Although "issuer" includes numerous entities, it does not include a hospital district established under chapter 281 of the Health and Safety Code. *Id.* § 1(1). Therefore, we need not determine whether the warrant is a credit agreement authorized under article 717q.

In brief, the District is expressly authorized to acquire and manage a hospital system and to provide medical and hospital care for the needy residents in the county. It may borrow money for hospital purposes. Specifically, the El Paso County Commissioners Court, in the name of and for the District, or the District may issue bonds or other obligations to acquire or equip hospital facilities or issue refunding bonds to retire outstanding bonds or other obligations. In this regard, we note that

bonds or other negotiable debt can only be issued for the purposes and in the manner expressly authorized. *See San Antonio Union Junior College Dist. v. Daniel*, 206 S.W.2d 995, 999 (Tex. 1947) (and cases cited therein) (power to issue negotiable paper beyond powers of city or county unless specially granted and when granted, can only be exercised in mode and for purposes specified, concluding that junior college district not authorized to issue refunding bonds); *see also Lopez v. Ramirez*, 558 S.W.2d 954, 957 (Tex. Civ. App.–San Antonio 1977, no writ) (statutes regarding authority to create debt must be strictly and narrowly construed citing *Robertson v. Breedlove*, 61 Tex. 316 (1884), and *Daniel*).

As is evident from the statutory provisions discussed above, the District does not have express authority to undertake a warrant transaction to hedge against interest rate fluctuations as evidenced by the issuance of a warrant. And for the reasons explained below, we conclude that the District does not have the implied authority to issue such a warrant derived from its authority to borrow money, *i.e.*, to issue or retire bonds.

Implied powers of the District are those that are indispensable to effectuate the District's express purposes and not those that are merely convenient or useful. *See Mann*, 142 S.W.2d at 947. The District is specifically authorized to issue bonds or other obligations for hospital facilities and equipment. It is true that when a governmental entity has express authority to acquire or construct facilities and expend money for them, it may have implied authority to finance those facilities by means other than issuance of bonds. *See, e.g., San Antonio River Auth. v. Shepperd*, 299 S.W.2d 920 (Tex. 1957) (county impliedly authorized to enter into long-term contractual obligation to finance flood control facilities based on its express authority to engage in flood-control programs and expend taxes therefor); *Lasater v. Lopez*, 217 S.W.2d 373 (Tex. 1919) (county impliedly authorized to issue warrant for road improvements; long-standing authority to issue warrant for public improvements not repealed by express authority to issue road bonds); Tex. Att'y Gen. Op. No. JM-642 (1987) (county and city impliedly authorized to borrow money to improve joint county-city hospital based on their express authority to maintain and equip hospital and expend tax funds therefor). The warrant, however, is not issued to acquire any hospital facilities, equipment, or even provide a required hospital service. Nor is the warrant related to bonds or obligations issued to acquire hospital facilities. First, it does not change the terms of the outstanding obligations or reduce the interest payments on those obligations. Second, it provides no benefit or service necessary to the issuance of those bonds—the outstanding bonds in reference to which the profit or loss under the warrant is calculated would have been issued prior to the warrant transaction. In short, given that the warrant does not relate to the acquisition of hospital facilities or the issuance of bonds for that purpose, it cannot be indispensable to effectuate either of those District purposes.

Nor is the warrant indispensable to effectuate the District's authority to redeem or refund outstanding bonds. As indicated earlier, the District also has express authority to issue refunding bonds to retire its outstanding bonds or other obligations. The warrant is not issued to retire any outstanding bonds or obligations. Any outstanding bonds are retired only when and if the District refunds its outstanding bonds by the issuance of refunding bonds or otherwise retires them with moneys derived from other sources. Moreover, the warrant does not provide a benefit or service

necessary to the issuance of the refunding bonds when and if they are authorized. Issuance of the warrant is a separate transaction undertaken in lieu of or prior to the issuance of refunding bonds—it is undertaken precisely because the issuer is at the time unable or unwilling to issue refunding bonds.

If the District does not have the authority to issue a warrant derived from its specific authority to issue bonds and refunding bonds to which the warrant would purportedly relate, that authority cannot be inferred from the general authority to manage and control the hospital system. *See Mann*, 142 S.W.2d at 947 (when powers are granted by specific statutory provisions, they are not enlarged by general language elsewhere in the statute); *cf. Canales v. Laughlin*, 214 S.W.2d 451, 457 (Tex. 1948) ("The specific statutes covering this particular matter [employment of person to supervise county road system] are controlling in this case over the general provisions . . . ."). A contrary rule—that the general authority to manage and control authorizes any specific financial vehicle or means the District finds useful or convenient—would render most specific statutes providing for or limiting governmental borrowing powers superfluous. *See Mann*, 142 S.W.2d at 947; *Canales*, 214 S.W.2d at 457.

Our interpretation here, that the authority to issue a warrant or undertake other derivative transactions cannot be implied from the specific authority to issue or refund bonds or from the general authority "to manage and control," is supported by legislative enactments. The legislature has expressly authorized certain governmental entities to enter into particular derivative contracts in prescribed circumstances. *See, e.g.*, TEX. REV. CIV. STAT. ANN. art. 717q (Vernon Supp. 1999) (authorizing certain issuers to enter into swap contracts in connection with issuance of bonds or other obligations that are subject to Attorney General approval); TEX. NAT. RES. CODE ANN. § 161.074 (Vernon Supp. 1999) (authorizing Veterans Land Board to enter into interest rate swap agreements, currency swap agreements, or forward payment conversion agreements in order to place Board's bonds on desired interest rate basis); TEX. TRANSP. CODE ANN. § 452.102 (Vernon Supp. 1999) (authorizing regional transportation authority to invest its funds in interest rate swap or similar agreements); TEX. GOV'T CODE ANN. § 2306.351 (Vernon 1999) (authorizing Department of Housing and Community Affairs to enter into interest rate swap agreements, currency swap agreements, or forward payment conversion agreements in order to place Department bonds on desired interest rate basis); *but see* TEX. GOV'T CODE ANN. §§ 2256.009(b), .024(b) (prohibiting governmental bodies, other than those specifically named, from investing in collateralized mortgage obligations on which interest rate is tied to index that adjusts opposite market index). Thus, when the legislature intends that a governmental body have the authority to undertake derivative transactions it so expressly provides.

As indicated earlier, the District's bond counsel for the Warrant transaction contends that the District has implied authority to issue an interest rate hedge warrant based on its express authority to issue bonds and refunding bonds, relying on Texas cases and attorney general opinions that, according to bond counsel's letter brief, have recognized "a variety of powers . . . in the context of public finance, even where an express grant of the power does not exist." Mendel letter of 11/17/98, at 7 (citing *Lasater*, 217 S.W.2d 373; *Shepperd*, 299 S.W.2d 920; Tex. Att'y Gen. Op. Nos. JM-697 (1987), JM-642 (1987)). The cited authority is inapposite. These cases and attorney general

opinions recognize political entities' implied authority *only* to acquire public improvements by means other than the issuance of bonds, derived from the governmental entities' express powers to acquire and expend money for those improvements. *See Lasater,* 217 S.W.2d 373; *Shepperd,* 299 S.W.2d 920; Tex. Att'y Gen. Op. Nos. JM-697 (1987), JM-642 (1987). For example, in the leading case in this area, *Lasater v. Lopez,* 217 S.W.2d 373, the Texas Supreme Court upheld counties' implied authority to issue interest-bearing, time warrants to finance public improvements. This well-established, legislatively-sanctioned authority to issue non-negotiable warrants for road improvements, the court stated, was not abrogated implicitly by the more recent express authority to issue negotiable bonds for the same purpose. *Id.* at 376-77. Similarly, in *San Antonio River Authority v. Shepperd,* 299 S.W.2d 920, the Texas Supreme Court, relying on *Lasater* among other cases, upheld a county's implied authority to enter into a long-term contract payable from taxes to finance construction of flood-control facilities given the county's express constitutional authority to engage in and expend tax funds for flood control programs. *Id.* at 924. Likewise, in Attorney General Opinion JM-697, this office determined that a county has implied authority to finance a jail by a long-term, lease-purchase contract in view of its express authority and duty to provide a jail, relying on *Shepperd* and *Lasater. See* Tex. Att'y Gen. Op. No. JM-697 (1987); *see also Zimmelman v. Harris County,* 819 S.W.2d 178 (Tex. App.–Houston [1st Dist.] 1991, no writ) (county impliedly authorized to use nonprofit corporation to finance jail by lease-purchase arrangement). Finally, in Attorney General Opinion JM-642, this office determined that a city and a county have implied authority to borrow money from a bank to finance joint city-county hospital improvements given their express powers to maintain and equip a hospital and to issue bonds. *See* Tex. Att'y Gen. Op. No. JM-642 (1987) (also relying on *Shepperd* and *Lasater*). The warrant in question is not issued to acquire hospital facilities or improvements.

Bond counsel's brief also contends that "[i]n the area of public finance, State courts have been particularly expansive in construing the powers of political subdivisions, concluding long ago that political subdivisions should have powers similar to private persons in matter pertaining to indebtedness" to support its contention that a hospital district is impliedly authorized to issue an interest rate hedge warrant. Mendel letter of 11/17/98, at 7 (citing *Dallas County v. Lockhart,* 96 S.W.2d 60 (Tex. 1936); *Frio County v. Security State Bank of Pharr,* 207 S.W.2d 231 (Tex Civ. App.–Waco 1947, no writ)). The authority cited does not support this proposition or the authority to issue the warrant. The cases cited actually deal with *express statutory authority* to elect the method of redeeming bonds that best served the issuer's purposes.

In one of the cases, *Dallas County v. Lockhart,* 96 S.W.2d 60 (Tex. 1936), the Texas Supreme Court upheld a county's statutory authority to redeem bonds with the cash proceeds of refunding bonds against a contention that such refunding could be accomplished only by an exchange of the old bonds for the new ones. In this context, the court stated:

> All of the statutes with reference to redeeming and refunding are complementary to one another and should be considered together. Thus considered, they clearly evidence a legislative intent to vest counties and municipalities, as nearly as may be, with the same rights

> as other creditors, by providing a flexible, equitable, and businesslike plan for financing their bonded indebtedness to meet changing conditions.

*Id.* at 63. Similarly, in the other case, *Frio County v. Security State Bank of Pharr*, 207 S.W.2d 231 (Tex Civ. App.–Waco 1947, no writ), the court considered a statute that allowed a county to reserve the right to redeem bonds prior to maturity as the county determined, "in order that it might handle its business affairs with reference to the issuance of refunding bonds in such manner as would seem to [its] best advantage . . . ." *Id.* The county had reserved a right to redeem some of its bonds prior to maturity but not others. *Id.* The court held that the county was bound by its election and could not redeem prior to maturity those bonds that were not subject to early redemption. *Id.* Thus, contrary to bond counsel's assertion, the courts in these cases did not conclude that political subdivisions have financing powers similar to private persons; rather, those cases address statutes whereby the legislature provided political subdivisions with "powers similar to private persons in matters pertaining" to governmental debt with respect to the specific available methods for refunding bonds. The legislature has not afforded similar powers with respect to derivative contracts to hospital districts. Accordingly, the cases cited are inapposite.

In conclusion, although an interest rate hedge warrant may be a desirable financial product to profit from interest rate fluctuations in the market to mitigate the burden of interest payments on outstanding bonds, it is not indispensable to effectuate the issuance of new money bonds, refunding bonds, or otherwise effectuate the redemption of outstanding bonds. Accordingly, the authority to issue the warrant may not be inferred from the authority to borrow money and issue bonds. Nor can that authority be inferred from the District's general authority to manage and control the hospital system. Therefore, it is the opinion of this office that the District does not have authority to execute a contract to hedge against interest rate fluctuations evidenced by the issuance of a warrant.

## S U M M A R Y

A hospital district is not authorized to execute an interest rate hedge contract that entitles the district to receive a lump sum if market interest rates rise in relation to the interest rate on certain outstanding district bonds but that requires the district to pay out a lump sum if interest rates fall.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Prepared by Sheela Rai
Assistant Attorney General